IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. _19-cv-2742_____

BETTY JEAN JOHNSTON, as trustee
of the Betty Jean Johnston Trust, on behalf
of itself and on all others similarly situated,

      Plaintiffs,

v.

CAMINO NATURAL RESOURCES, LLC,
a Delaware limited liability company,

      Defendant.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff[1] Betty Jean Johnston Trust ("Plaintiff"), on behalf of itself and the Classes of all others similarly situated, brings this Class Action Complaint against Camino Natural Resources, LLC ("Camino"), and alleges and states the following.

### SUMMARY OF ACTION

1.    Plaintiff and the Class bring claims against Camino concerning Camino's actual, knowing and willful underpayment, late payment or non-payment of royalties and oil-and-gas proceeds from wells through improper accounting methods (such as not paying on the starting

---

[1] Because Betty Jean Johnston, as trustee, brings this action on behalf of the Betty Jean Johnston Trust, the term "Plaintiff," as used throughout this Complaint refers to the Trust.

price for gas products but instead taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

### JURISDICTION AND VENUE

2.     This Court has original jurisdiction over the claims asserted in this complaint pursuant to 28 U.S.C. § 1332(d) because this is a class action for which the amount in controversy exceeds the sum of $5,000,000 and because members of the Classes and Camino are citizens of different states.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Camino maintains its principal place of business within this District.

### PARTIES

4.     Betty Jean Johnston is trustee of the Betty Jean Johnston Trust (the "Trust" or "Plaintiff"), a trust organized under the laws of Oklahoma. Plaintiff owns royalty interests in at least one Camino operated well that produces gas: the Johnston 31–12–7 Well located at 31–12N–7W in Canadian County, Oklahoma. Plaintiff's royalty interests in that well stem from an oil-and-gas lease attached as **Exhibit 1**, which includes an Express Fuel Clause entitling Plaintiff to royalty for all gas used off the leased premises.

5.     Camino is a limited liability company organized under Delaware law with its principal place of business in Denver, Colorado. Camino may be served with process by serving its registered agent, Cogency Global Inc., 7700 E. Arapahoe Road, Suite 220, Centennial, CO 80112.

6.     Camino is in the business of producing and marketing oil-and-gas and constituent products from the wells in which the Class members hold interests.

7.     Camino and its affiliated predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on their behalf and all those to whose prior leasehold interests they have succeeded and for whom they are legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendant" or "Camino."

8.     The acts charged in this Complaint as having been done by Camino were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Camino's business or affairs, and within the scope of their employment or agency with Camino.

## CLASS I ALLEGATIONS
## CLASS I – ROYALTY DEDUCTIONS

9.     Plaintiff brings this action on behalf of itself and as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass ("Class I" and "Class I Subclass"):

> All royalty owners in Oklahoma wells where Defendant (including its affiliated predecessors and affiliated successors) are or were the operator (or a working interest owner who marketed its share of gas and directly paid royalties to the royalty owners). The Class claims relate to royalty payments for gas and its constituents (such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate).

> **CLASS I SUBCLASS**: All persons entitled to share in royalty proceeds payable under any lease that contains an express provision stating that royalty will be paid on gas used off the lease premises (an Express Fuel Clause).

> Excluded from the Class and Subclass are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) the State of Oklahoma or any of its agencies or departments that own royalty interests; (3) Defendant, its affiliates, predecessors, and employees, officers, and directors; (4) any publicly traded company or their affiliated entity that produces, gathers, processes, or markets gas; (5) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect at

the time suit was filed herein; (6) overriding royalty owners and others whose interest was carved out from the lessee's interest; (7) royalty owners who have already filed and still have pending lawsuits for underpayment of royalties against Defendant at the time suit is filed herein; (8) royalty owners only to the extent they take gas in-kind, if any; and, (9) royalty owners only to the extent receiving "Blanchard" payments.

10.    The members of Class I and Class I Subclass are so numerous and geographically dispersed that joinder of all members is impracticable.

11.    Camino operates or has operated hundreds of Class I Wells that produce gas. Camino holds a working interest in these Wells, with at least one, and usually multiple, royalty owners for each well.

12.    Camino has within its possession or control records that identify all persons to whom it (including affiliated predecessors and those for whom it is legally responsible) has paid royalties from Class I Wells during the Class Period.

13.    The questions of fact or law common to Plaintiff, Class I, and Class I Subclass include, without limitation, one or more of the following:

    a.    Whether the Plaintiff and members of Class I are beneficiaries of the implied Marketable Condition Rule (MCR), which requires Camino to sever the gas from the ground and to prepare the gas for market at Camino's sole expense.

        i.    If so, whether: 1) the Midstream Costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for market such that none of them should have been deducted from royalties but all of them were; or 2) whether the market for gas occurs before GCDTP are incurred such that the Class's claim is only for excessive deductions of Midstream Costs.

        ii.    If not, whether the Class members were party to a lease that expressly allows deduction of all of the GCDTP Midstream Costs ("Express Deduction Lease" or "ED Lease"), such that these Class members have a claim only for excessive deductions of Midstream Costs, and if so, whether the Midstream Costs actually deducted were excessive in amount.

      b.      Whether Camino paid royalty to Plaintiff and members of Class I for all valuable constituents coming from their wells and which inured to Camino's benefit either: 1) through credit toward the Midstream Costs; or 2) by contractual consideration in-kind to a midstream company (such as drip condensate, helium, liquefied nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U).

      c.      Whether Camino (including any of its affiliates) paid royalty to Plaintiff and members of Class I based on a starting price below what Camino or its affiliates received in arm's-length sales transactions.

      d.      Whether Class I Subclass leases have Express Fuel Clauses.

          i.      If so, whether Defendant failed to pay for the gas from Class I Subclass Wells used off the leased premises.

      e.      Whether class-wide damages be calculated for Plaintiff's theories of liability.

14.    Plaintiff is typical of other Class I members because Camino pays royalty to Plaintiff and other Class I members using a common method. Camino pays royalty based on the net revenue Camino receives under its gas contracts which terms royalty owners do not know or approve. The contracts are for services necessary to place the gas and its constituent parts into marketable condition so they can be sold into recognized, active, and competitive commercial markets.

15.    Further, Plaintiff is typical of other Class I Subclass members because Plaintiff's oil-and-gas lease contains an Express Fuel Clause.

16.    Plaintiff will fairly and adequately protect the interests of the members of Class I and Class I Subclass. Plaintiff is a royalty owner to whom Camino pays royalty. Plaintiff understands its duties as Class I and Class I Subclass representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

17.    This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of Class I and Class I Subclass, and those common questions

predominate over any questions solely affecting individual members of such Class. *See supra*, ¶ 15. There is no need for individual Class I and Class I Subclass members to testify in order to establish Camino's liability to or damages sustained by Plaintiff and members of Class I and Class I Subclass.

18.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of Class I and Class I Subclass. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Camino. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class I and Class I Subclass members.

19.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of Class I and Class I Subclass. Joinder of all Class I and Class I Subclass members would be either highly impracticable or impossible. And the amounts at stake for individual Class I and Class I Subclass members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Camino will likely retain the benefit of its wrongdoing.

## GAS INDUSTRY BACKGROUND

20.     The members of Class I own royalty interests in wells that produce gas and constituents that are transformed into marketable products and sold into the established commercial markets for those products.

21.     Camino's method for calculating royalty to the members of Class I is subject to uniform accounting procedures and implied marketable product law.

22.     Oklahoma law requires the lessee to bear all of the costs of placing gas and its constituents into "Marketable Condition" products.

23.     Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

24.     Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

25.     The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue.

26.    But, the oil-and-gas companies have used undisclosed internal accounting practices to try to keep for themselves as much of the well revenue as possible. These accounting practices are at the heart of every oil-and-gas royalty case.

27.    Rather than adopting transparency in its royalty calculation formula, Camino, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of information necessary to understand how Camino calculates royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling the lessee to breach the oil-and-gas lease without accountability.

28.    If and when one or more of the royalty owners learn of the "breach," the royalty owner has only three options—all of which are poor: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the "breach" only results in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

**Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production**

29.    The gas is gathered from each well, dehydrated and compressed, through underground gathering lines crossing many miles of land to processing plants where the raw gas is transformed into two primary products: methane and fractionated natural gas liquids ("NGLs").

8

Once homogenized as fungible products, the residue gas and NGLs are sold in the commercial

market.

### Wellhead (Basic Separation and Gas Measurement)

30.    The diagram below illustrates the gas conditioning process:



*See* http://www.kgs.ku.edu/Publications/Oil/primer13.html (last visited Sept. 11, 2019).

31.    Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen,

etc., all mixed together in the gas stream.[2] After the stream comes out of the ground, it enters the

free water knockout (a/k/a three-phase separator) which separates the products by gravity, water

at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator

---

[2] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[3] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly in oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold (the payment of oil royalties is not at issue in this Class I).

32.    Since production over time depletes the pressure of a well, on rare occasion, on-lease compressors are installed to suction gas out of the well or to move the gaseous mixture down the gathering lines. But when they are installed, their use requires fuel (the "on-lease compression" or "vacuum compression" cost).

33.    The gaseous mixture produced from a single well cannot be processed economically, so the mixtures from many wells are "gathered" together through gathering lines and delivered to a processing plant for transformation into marketable products and sale into commercial markets. This results in a gathering cost (G). The below diagram provides an overview of the midstream services deduction process. Camino does not improperly deduct from royalty any of the costs before the gathering line inlet.

---

[3] A minute portion of this raw gas may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

**Midstream Services (GCDTP) Deductions**



34.    As the gaseous mixture from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The meter run must be constantly maintained to record accurate measurements.

35.    Gathering pipelines are usually made of metal that could be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D).

36.    Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are

installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression cost (C).

37.    The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Generally lessees pay no royalty on the revenue generated from the sale of the drip condensate.

38.    Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Lessees pay no royalty on the volume of L&U.

**Natural Gas Processing**

39.    Once a sufficient amount of the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

40.    Lessees, such as Camino, use gas processing plants that either they or a third party own. Usually an unrelated third party owns the processing plant but the plant may also be owned in whole or in part by a lessee.

41.    The plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T).

42.    The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), NGLs raw make, and in the Panhandle of Oklahoma, crude helium.

a.  Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas".

b.  The raw make NGLs are used as a feedstock in the petrochemical and oil refining industries; they are a more valuable commodity than methane. To separate the NGLs from the gaseous mixture, they are cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The NGLs move into a liquids pipeline and processed by a fractionator into their marketable products: ethane; propane; butanes; and pentanes plus. In the gas contracts, this process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as consideration for other services the midstream company provides.

c.  Helium is processed into Grade A helium at new processing plants or into crude helium (contaminated with nitrogen) at older plants which is then processed into Grade A helium at a nearby helium processor (often a few hundred feet away).

43.    This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Lessees do not pay royalty on plant fuel, even though it comes from Class Wells.

44.    At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at that point.

## Marketable Condition for the Products

45.     *Methane Gas*. Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

46.     *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products – ethane, propane, butane, isobutene, natural gasoline, etc. In computing royalty for NGLs, Camino improperly deducts processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.

47.     *Drip Condensate*. Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant, and is essentially in marketable condition when collected.

48.     *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and into parts of Wyoming), helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents but lessees pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken.

## Sale of Products

49.     To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial market place in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at OPIS, and any other marketable products at the prices established by their respective commercial

markets. Lessees attempt to obscure this fact with self-serving language in gas marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

50.    The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from Camino's market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

51.    Affiliate gas contracts are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate in the commercial market is the true sale that should be used as the "starting price" for marketable condition gas products.

   a.    Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and

market the gas and constituent products; and/or (3) pay on the lower

lessee/affiliate sale price and not the higher affiliate/third party price.

b.  WASP involves a pool of sales transactions to third parties (and/or

affiliates) and combines the prices paid by those third parties (and/or

affiliates) to arrive at a "weighted average sales price." Lessees can

manipulate this process by using lower lessee/affiliate sales prices for part

of the pool price, rather than all third party arm's length sale prices.

52.  Fictitious "sales" (also known as sham sales or conditional sales) are created by

lessees in an effort to pass off a non-commercial market sale as if it should be the starting point

for royalty payments. But none of these efforts comport with economic reality or are in good faith

with respect to royalty owners. For instance:

a.  Anything of value can be sold at any place and in any condition.

b.  Gas and other minerals can and are routinely sold in the ground, but they

are not in marketable condition.

c.  Gas could be sold at the bottom of the hole when it is severed from the

surrounding rock and enters the downhole pipe. Although a contract driller

might be willing to accept some percentage of the future sale of oil or gas

in the real marketplace as compensation for his drilling services, that

agreement does not make the transaction a real market sale.

d.  Gas could be sold "at the wellhead" when the gas is severed from the

surface. Although a contract operator might be willing to accept some

percentage of the future sale of oil or gas in the real marketplace as

compensation for his well operating services, that transaction does not make it a real market sale.

e.      Gas also could be sold at the gathering line inlet when the gas enters the gathering line and changes custody. Although a contract gatherer might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that transaction does not make it a real market sale.

f.      Gas also could be sold at the processing plant inlet when the gas changes custody to the processing plant. Although a contract processor might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his processing services, that transaction does not make it a real market sale.

g.      The lessee could simply pay for all of these services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market – Index or OPIS.

h.      Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with Midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future

downstream services that usually passes with a true title transfer and market

sale does not happen; (iii) the starting price that would occur with a true title

transfer and market sale does not happen. Indeed, the paper title transfer is

unnecessary to receiving the Midstream services as the gas could (and

sometimes does) receive the exact same Midstream services without the

paper title transfer.

i.      All of the gas contracts implicitly recognize this paper title transfer fiction,

as the starting price for gas products always is at the Index and OPIS market

pool as previously described.

j.      Midstream services providers are not buyers and resellers of raw gas. They

are service providers that convert raw gas into pipeline quality gas so it can

enter the Index or OPIS market pools. Indeed, they are called Midstream

servicers, not Midstream purchasers.

**Different Ways Camino Underpays Royalty Owners**

53.     The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-

lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All

payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are

firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and

operational practices. As a result, there are many ways that royalty owners are underpaid on their

royalty interests, and they never know it. The common thread through all of these schemes is that

they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

54. Camino represents the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

55. Camino underpays royalty to Plaintiff and other Class I Members in one or more of the following ways:

  a.  *Residue Gas*. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All of Camino's gas contracts will show this to be true. But, instead of paying on that gross competitive price, Camino pays on a net price after directly taking or allowing midstream companies to indirectly take Midstream Services deductions (both monetary fees and in-kind volumetric deductions).

  b.  *NGLs*. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All of Camino's gas contracts will show this to be true. But instead of paying on that gross competitive price, Camino pays royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) after deducting processing fees and expenses (often keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs as payment for the processing services); and, (iii) after reducing payment by T&F.

c.    *Drip Condensate.* Plaintiff and Class I Members' wells produce heavy hydrocarbons that condense in the pipeline. Camino (or a third-party on behalf of Camino (gatherers and/or processors)) recovers those hydrocarbons for sale. Camino fails to pay any royalty for that Drip Condensate.

d.    *Other Products.* Helium is contained in the well-stream produced from Plaintiff's and many Class I Members' wells, but Camino: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deducts processing fees and costs even though the helium is not yet in commercial grade; and (iii) pays at a lower than commercial Grade A price. Often times, Camino does not pay any royalty at all for Helium, for liquid nitrogen, or other products taken from Plaintiff's and the Class I Members' wells.

56.    Camino underpays all other Class I Members, from whom Camino is legally entitled to deduct post-production Midstream Services Costs, by taking excessive deductions under Midstream Services Contracts that allow excessive monopoly charges for GCDTP services.

57.    Camino underpays Class I Subclass members by failing to pay royalties on fuel used off the leased premises despite express contractual obligations to pay such royalties.

**ACTUAL, KNOWING AND WILLFUL
UNDERPAYMENT OR NON-PAYMENT OF ROYALTIES**

58.    The underpayment and non-payment of royalties are done with Camino's actual and willful knowledge and intent.

20

59.     Camino is well familiar with the fact that many other producers in Oklahoma have resolved the same claims for hundreds of millions, if not billions, of dollars or have changed their royalty payment practices to cease improperly deducting.

60.     Nevertheless, Camino continues its improper payment practices with actual and willful knowledge and intent.

## CLASS I CAUSE OF ACTION
## BREACH OF LEASE

61.     The allegations set forth above are incorporated herein by reference.

62.     Plaintiff and the other Class I Members entered into written, fully executed, oil-and-gas leases with Camino, and those leases include implied covenants requiring Camino to prepare the gas and its constituent parts for market at Camino's sole cost. And, for Class I Subclass, the Express Fuel Clauses required Camino to pay royalty on fuel used off the leased premises. The leases also place upon Camino the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and good faith and fair dealing.

63.     At all material times, Plaintiff and Class I members have performed their terms and obligations under the leases.

64.     Camino breached the terms of the leases, including the implied covenants, by its actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream.

65.     As a result of Camino's breaches, Plaintiff and the Class I members have been damaged through underpayment of the actual amounts due.

66.     Further, Plaintiff and the Class I Subclass members have been damaged by Newfield's failure to pay for gas used off the leased premises, which is a breach of the Express Fuel Clauses.

67.    Plaintiff, Class I, and Class I Subclass are entitled to the actual damages caused by Camino's breaches and are further entitled to statutory interest and other allowable damages imposed by Oklahoma law, including punitive damages. *See* OKLA. STAT. tit. 52, § 570.1 *et seq.*

## CLASS II ALLEGATIONS
## CLASS II – UNTIMELY PAYMENTS

68.    The allegations set forth above are incorporated herein by reference.

69.    Class II concerns Camino's willful and ongoing violations of Oklahoma law related to payment of oil-and-gas production proceeds ("O&G Proceeds") to persons with a legal interest in the mineral acreage under a well which entitles such person(s) (i.e., the "Owner") to payments of O&G Proceeds.

70.    Plaintiff is an Owner in oil-and-gas wells in Oklahoma in which Camino has incurred an obligation to pay O&G Proceeds. Camino is the operator of the wells and pays royalty to Plaintiff and is statutorily obligated to pay interest to Plaintiff.

71.    The oil-and-gas industry has historically been rife with abuse by lessees and operators who routinely delay and/or suspend payments to Owners to, among other things, obtain interest-free loans at the expense of Owners. Because of the lessee's or operator's control over the relationship, they are able to easily and successfully employ such schemes.

72.    Oklahoma law attempts to redress and prevent such abuses by requiring companies, including Camino, to pay interest on "proceeds from the sale of oil or gas production or some portion of such proceeds [that] are not paid prior to the end of the applicable time periods provided" by statute ("Untimely Payments"). OKLA. STAT. tit. 52, § 570.10(D); *see generally*, OKLA. STAT. tit. 52, § 570, *et seq.* (the "Production Revenue Standards Act" or the "Act").

73.    The Act gives Owners a uniform, absolute right to interest on Untimely Payments, regardless of whether such payments were previously suspended to address title marketability

22

issues, or any other reason such payments were not made within the time limits required by the Act. The plain language of the Act imposes an obligation to include interest on Untimely Payments. Compliance with this statutory requirement is not optional and does not require a prior written or oral demand by Owners.

74.    Camino is well aware of its obligations to pay the required interest on Untimely Payments. Nevertheless, in violation of Oklahoma law, Camino ignored its obligation to pay interest on Untimely Payments made to Plaintiff. Indeed, on information and belief, Camino routinely delays payment of production proceeds and denies Owners the interest payments to which they are entitled as part of an overarching scheme to avoid its obligations under Oklahoma law.

75.    Accordingly, Plaintiff files this Class II lawsuit against Camino to obtain relief on behalf of all similarly situated Owners who received any Untimely Payments for which Camino did not include payment of interest as required by the Act.

76.    Plaintiff files this Class II lawsuit against Camino for breach of its statutory obligation to pay interest and fraud. Additionally, Plaintiff seeks an accounting, disgorgement, and injunctive relief against Camino.

77.    Plaintiff brings this Class II action on behalf of itself and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All non-excluded persons or entities who: (1) received Untimely Payments from Camino (or Camino's designee) for O&G Proceeds from Oklahoma wells; and (2) whose payments did not include statutory interest.

> Excluded from Class II are: (1) Camino, its affiliates, predecessors, and employees, officers, and directors; (2) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; and (3) publicly traded oil-and-gas companies and their affiliates.

78.     Upon information and belief, absent Class II members who are entitled to interest owing on Camino's Untimely Payments number in the thousands. Therefore, the Class is so numerous that joinder of all members is impracticable.

79.     The questions of fact and law common to Class II members, include:

    a.   Whether Plaintiff and Class II members own legal interests in the Oklahoma mineral acreage upon which Camino has an obligation to pay O&G Proceeds;

    b.   Whether, under Oklahoma law, Camino owed interest to Plaintiff and Class II members on any Untimely Payments;

    c.   Whether Camino's failure to pay interest to Plaintiff and Class II members on any Untimely Payments constitutes a violation of the Act;

    d.   Whether Camino defrauded Plaintiff and Class II members by knowingly withholding statutory interest; and

    e.   Whether Camino is obligated to pay interest on future Untimely Payments.

80.     Plaintiff's claims are typical of Class II claims because the claims are identical for each Class member.

81.     Camino treated Plaintiff and Class II members in the same way by failing to pay the required interest on Untimely Payments.

82.     Plaintiff will fairly and adequately protect the interests of Class II. Plaintiff's interests do not conflict with the interests of Class II members. Plaintiff is represented by counsel who are skilled and experienced in oil-and-gas matters, accounting, and complex civil litigation, including class and mass actions.

83.     The averments of fact and questions of law herein, which are common to the members of Class II, predominate over any questions affecting only individual members.

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

a. The questions of law and fact are so uniform across Class II that there is no reason why individual members of Class II would want to control the prosecution of their own actions, at their own expense;

b. To Plaintiff's knowledge, there is no pending litigation by any individual Class II member, with the same scope of class membership of this lawsuit, against Camino relating to Camino's failure to pay interest owing on the Untimely Payments of O&G Proceeds as required by law;

c. The interests of all parties and the judiciary in resolving these matters in one forum without the need for multiplicity of actions is great;

d. The difficulties in managing this case as a class action will be slight in relation to the personal benefits to be achieved on behalf of each and every Class II member, and not just those who can afford to bring their own actions; and

e. Absent a class action, Plaintiff and Class II members may never discover the wrongful acts of Camino, the extent of their respective financial losses, or the financial benefit they are unwittingly providing to Camino.

## CLASS II GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

85. The allegations set forth above are incorporated herein by reference.

86. Camino owned and/or operated (and/or Camino owned a working interest in) numerous oil and/or gas wells throughout Oklahoma. Camino owed payments of O&G Proceeds to Plaintiff and Class II members as a result of the mineral production from such wells.

87. "For decades, oil-and-gas producers or first purchasers would for various reasons delay or decline to distribute the proceeds from the first sale to interest owners and use those funds for their own purposes until they were ultimately distributed, if at all." 2015 OK AG 6, ¶ 2 (Sept. 1, 2015) (citing Si M. Bondurant, *To Have and to Hold: The Use and Abuse of Oil and Gas Suspense Accounts*, 3 OKLA. CITY U. L. REV. 1, 4 (2006)). Holders of the production proceeds, however, frequently and intentionally avoided making any reasonable efforts to locate interest owners or notify them of their interest. *See id.* Instead, they would "suspend" their revenue payments until demanded and, in the meanwhile, gain the benefit of the possession of those funds. *See id.* Moreover, even when they eventually made the revenue payments, the holders often would

not pay interest. *See id.* "[T]here was a great incentive to delay royalty payments" and "many producers routinely suspended royalties and delayed payment for many months and even years to take advantage of the interest earned during the float between the receipt of sales proceeds and disbursement of royalties." *See id.* (citing Bondurant at 18). This not only deprived interest owners of the time-value of the money owed to them, it also gave rise to "an ever increasing case load of litigation between royalty owners and purchasers . . . precipitated by the use of suspense accounts." *Id.* (citing *Hull v. Sun Refining & Mktg. Co.*, 1989 OK 168, ¶ 9, 789 P.2d 1272, 1277).

88.     As a result of this conduct, many states—including Oklahoma—enacted statutes to curtail this abuse. In Oklahoma, the Act requires Camino to make payments within certain time periods. Further, the Act requires Camino to pay interest on any Untimely Payments, regardless of the reasons why such payments were delayed. The Act gives Owners an absolute right to interest on Untimely Payments. The plain language of this statute imposes an obligation to include interest on Untimely Payments. Compliance with this statute is not optional and does not require a prior written or oral demand by royalty owners.

89.     Plaintiff and Class II members were entitled to payment of O&G Proceeds from Camino and, pursuant to the Act, were further entitled to interest on any Untimely Payments from Camino.

90.     Plaintiff and Class II members placed their trust and confidence in Camino to pay them the O&G Proceeds to which they were entitled, including any interest owed thereon. Camino had superior access to information regarding O&G Proceeds and the amounts it owed to Plaintiff and Class II members, including interest, on Untimely Payments.

91.     When Camino made Untimely Payments to Plaintiff and Class II members, Camino failed to pay the interest owed pursuant to the Act. Indeed, on information and belief, Camino's

failure to pay the statutorily required interest on Untimely Payments continues to this day as part of an ongoing scheme to avoid paying money clearly owed under Oklahoma law.

92.     Camino is not permitted to take advantage of its relationship with Plaintiff and Class II members to realize unauthorized benefits or profits at the expense of Plaintiff and the Class II members. Camino has used its position as the holder of Plaintiff's and Class II's O&G Proceeds to avoid its statutory obligation to pay the statutory interest due to Plaintiff and Class II members in the event of Untimely Payments. As such, Camino has improperly treated Plaintiff's and the Class II members' O&G Proceeds as an interest-free loan without their consent.

93.     Upon information and belief, Camino ignored its obligation under the Act to regard the O&G Proceeds it owed to Plaintiff and Class II members as separate and distinct from Camino's other cash assets. Rather, these proceeds were comingled with Camino's other cash assets. As such, Camino improperly, unfairly and in violation of the law profited from its deliberate refusal to pay statutory interest to Plaintiff and Class II members.

94.     In short, Camino blatantly ignored Oklahoma law regarding the payment of interest on Untimely Payments. Further, Camino did not hold the O&G Proceeds for the benefit of the owners legally entitled thereto (*i.e.* Plaintiff and Class II members) and, instead, held the O&G Proceeds for its own benefit. Camino has abused its position with Plaintiff and Class II members.

95.     Plaintiff and Class II members have been damaged by Camino's unlawful acts and omissions.

96.     Camino's wrongdoing—which clearly violates Oklahoma law—is ongoing and continues to this day.

## CLASS II CAUSES OF ACTION
### COUNT I – BREACH OF STATUTORY OBLIGATION TO PAY INTEREST

97.     The allegations set forth above are incorporated herein by reference.

98.     Plaintiff brings this cause of action on behalf of itself and Class II members.

99.     Plaintiff and Class II members were legally entitled to the payment of O&G Proceeds from Camino for wells owned and/or operated by Camino in Oklahoma.

100.    Section 570.10 of the Act requires Camino to hold O&G Proceeds from the sale of oil and/or gas production for the benefit of the Owners legally entitled thereto.

101.    Section 570.10 of the Act requires payment of O&G Proceeds to be made in a timely manner according to the applicable time periods set forth in the Act.

102.    If the holder of any O&G Proceeds subject to the Act fails, for any reason, to make timely payments to persons entitled to receive such O&G Proceeds, the holder must pay interest on such O&G Proceeds when the payment is eventually made.

103.    Camino held O&G Proceeds belonging to Plaintiff and Class II members and Camino failed to timely pay O&G Proceeds owing to Plaintiff and Class II members.

104.    In violation of the Act, when Camino ultimately made its Untimely Payments to Plaintiff and Class II members, Camino did not pay the interest owing on the Untimely Payments.

105.    Camino's failure to pay interest owing on its Untimely Payments of O&G Proceeds was knowing and intentional and/or the result of Camino's gross negligence.

106.    Camino's failure to pay interest owing on its Untimely Payments of O&G Proceeds has caused Plaintiff and Class II members to suffer harm.

## COUNT II – FRAUD

107.    The allegations set forth above are incorporated herein by reference.

108.    Plaintiff brings this cause of action on behalf of itself and Class II members.

109.    Camino owned and/or operated (and/or Camino owned a working interest in) numerous oil and/or gas wells throughout Oklahoma. Thus, Camino knowingly and intentionally

took on the duties associated with such interests, including the duty to pay O&G Proceeds to Owners in accordance with Oklahoma law.

110.    Camino, however, took on such duties with the intent to deceive Owners and not pay the full O&G Proceeds owed. Specifically, Camino knew it owed interest on Untimely Payments, but knowingly and intentionally suppressed the fact that interest was owed to Plaintiff and the Class II members. Further, Camino intended to avoid its obligation to pay the statutorily mandated interest and only pay when an Owner specifically requests payment of the statutory interest.

111.    Plaintiff and Class II members relied on and trusted Camino to pay them the full O&G Proceeds to which they were entitled under Oklahoma law.

112.    Camino held all of the information relating to Untimely Payments and the interest owed on those payments, but it never disclosed to Plaintiff or the Class II members that such interest was owed.

113.    Plaintiff and Class II members have been damaged by Camino's actions and violations of law.

114.    Camino's failure to pay the interest it owes to Plaintiff and Class II members is a result of Camino's actual knowing and willful intent to deceive the members of the Class and to deprive such interest from persons Camino knows, or is aware, were legally entitled to such interest under the Act. Thus, Camino should be required to pay punitive damages as a method of punishing Camino and setting an example of others.

## COUNT III – ACCOUNTING AND DISGORGEMENT

115.    The allegations set forth above are incorporated herein by reference.

116.    Plaintiff requests an accounting on behalf of itself and Class II members.

117.    Plaintiff requests the Court enter an order directing Camino to provide an accounting to Plaintiff and Class II members which discloses: (a) the amount of accrued interest that Plaintiff and each Class II member should have been paid by Camino, and (b) the method for calculating such amounts.

118.    Camino's payment of interest owed to Plaintiff and Class II members does not provide an adequate legal remedy for the wrongs committed by Camino because it will not deprive Camino of the ill-gotten gains it has obtained through its unlawful behavior.

119.    The principles of equity and good conscience do not permit Camino to retain the benefits derived from its improper and unlawful use of interest owed on Untimely Payments made to Plaintiff and Class II members.

120.    Thus, Plaintiff requests the Court enter an order directing Camino to disgorge itself of any benefits derived from its improper and unlawful use of Plaintiff's and the Class II members' interest payments, including but not limited to interest that has accrued on such interest since the time in which Camino made the Disputed Payments to Plaintiff and Class II members.

## COUNT IV – INJUNCTIVE RELIEF

121.    The allegations set forth above are incorporated herein by reference.

122.    Plaintiff seeks injunctive relief on behalf of itself and Class II members.

123.    Unless enjoined by this Court, Camino will continue its pattern and practice of failing to pay interest owed on Untimely Payments to Plaintiff and Class II members.

124.    Camino has utilized its superior knowledge and control of information regarding Plaintiff's and Class II members' entitlement to interest on Untimely Payments to engage in a fraudulent scheme with regard to its willful and intentional failure to pay such interest. As such, Camino's wrongdoing is ongoing, and injuries in the future by Plaintiff and the Class are

irreparable in that the vast majority of Class II members remain unaware of their right to be paid interest on Untimely Payments.

125.    No adequate remedy at law exists for continuing violations of the Act by Camino.

126.    Plaintiff requests the Court enter a permanent injunction, ordering Camino to pay interest as required by law when Camino makes future Untimely Payments to Plaintiff and Class II members.

127.    Camino will not suffer any harm as a result of granting the Class II members' request for injunctive relief because Camino's compliance with the Court's order will be consistent with Camino's legal obligations and duties to Plaintiff and Class II members.

## PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiff seeks:

a.    An order certifying and allowing this case to proceed as a class action with Plaintiff as class representative for each class and the undersigned counsel as class counsel for each class;

b.    An order requiring Defendant to pay Plaintiff and all Class I, Class I Subclass, and Class II members actual damages to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Defendant's breaches and/or unlawful conduct including, without limitation, the compounded interest on Untimely Payments as required by law;

c.    An order requiring Defendant to provide Plaintiff and the Classes with an accounting where appropriate;

d.    An order requiring Defendant to disgorge itself of the ill-gotten gains it has obtained through the unlawful acts;

e.    An order requiring Defendant to pay interest in the future, as required by law, to Plaintiff and the Classes;

f.    An order awarding punitive damages as determined by the jury and in accordance with Oklahoma law on each of Defendant's wrongful acts, as alleged in this Complaint;

g.      An order requiring Defendant to pay the Classes' attorney's fees and litigation costs as provide by statute; and

h.      Such costs and other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all matters so triable.

Respectfully Submitted,

s/ Reagan E. Bradford _____
**Reagan E. Bradford**
**Margaret E. Robertson**
**Ryan K. Wilson**
THE LANIER LAW FIRM, P.C.
431 W. Main Street, Suite D
Oklahoma City, OK 73102
Telephone: (405) 698-2770
Facsimile: (405) 234-5506
reagan.bradford@lanierlawfirm.com
maggie.robertson@lanierlawfirm.com
ryan.wilson@lanierlawfirm.com

**COUNSEL FOR PLAINTIFF**